**HERRERA LAW PARTNERS**
135 Bay Street, Suite 8
Santa Monica, CA 90405
t. (310) 310-2201 | f. (310) 861-5405
savepaper@herreralawpartners.com

Evan Michal Hess, Esq. – State Bar No. 272492
d. (213) 545- 1660 | evan@herreralawpartners.com

Alejandro H. Herrera, Esq. – State Bar No. 284712
d. (310) 570-0513 | alex@herreralawpartners.com

*Attorneys for Plaintiff, Gregg Brevoort*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| GREGG BREVOORT, an individual,<br><br>　　　　Plaintiff,<br>　vs.<br><br>G4S SECURE SOLUTIONS (USA) INC., a Florida Corporation, and DOES 1 – 50, inclusive,<br><br>　　　Defendants. | Case No:  2:20-cv-05432-CJC-PVC<br><br>**FIRST AMENDED COMPLAINT FOR DAMAGES**<br><br>　1.　FAILURE TO PROVIDE MEAL PERIODS<br>　2.　FAILURE TO PROVIDE PAID REST PERIODS<br>　3.　HOSTILE WORK ENVIRONMENT<br>　4.　UNLAWFUL RETALIATION IN VIOLATION OF PUBLIC POLICY<br>　5.　UNFAIR COMPETITION<br>　6.　SEXUAL ORIENTATION DISCRIMINATION<br>　7.　INTENTIONAL INFLICTION OF EMOTION DISTRESS<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff, GREGG BREVOORT, a California individual, by and through counsel, for his Complaint against Defendants alleges as follows:

### I.

### INTRODUCTION

1.　This case arises out of the unlawful labor and payroll practices of Defendant, G4S SECURITY SOLUTIONS (USA), INC. ("G4S"). Plaintiff alleges he is owed money from G4S resulting from, *inter alia*, defendants' failure to provide meal and rest periods, maintaining and perpetuating a hostile work environment, retaliation, and discrimination of plaintiff.

2.      G4S and its employees engaged in a campaign of hostile acts reasonably expected to cause Mr. Brevoort considerable hardship. Mr. Brevoort was forced to work in an increasingly unhealthy environment over the course of his eight-and-one-half-year tenure as an employee of G4S. G4S refused to address overt and ongoing issues undertaken and perpetuated by its employees and managers that created a culture of fear and animus, thus establishing a policy of conduct and practice that created a harsh, aggressive, and hostile work environment.

3.      Further, G4S was responsible for engaging in unlawful retaliation and unlawful termination in violation of public policy. Mr. Brevoort was repeatedly and aggressively asked to "get on board" or risk termination when he voiced concerns with company policies.

4.      Finally, Mr. Brevoort was subjected to ongoing sexual orientation discrimination by fellow employees, supervisors, and executives.

5.      The foregoing conduct, which will be detailed, *supra*, was intended to and did cause Mr. Brevoort to suffer considerable emotional distress for which he has sought ongoing treatment. Accordingly, Mr. Brevoort now seeks damages, restitution, statutory penalties, civil penalties, attorneys' fees, costs, and other appropriate relief on behalf of himself.

II.

## JURISDICTION AND VENUE

6.      The California Superior Court has jurisdiction in this matter because Plaintiff is informed, believes, and thereon alleges that the monetary damages, restitution, and penalties sought herein for Defendant's violations of the California *Labor Code* and *Business & Professions Code,* exceed the minimal jurisdictional limits of the Superior Court.

7.      Plaintiff has filed a claim against G4S with the Department of Fair Employment and Housing. Plaintiff received a "Right to Sue Notice" dated May 6, 2020. Furthermore, the time to file a suit was tolled by agreement of Plaintiff and Defendants.

8.      Venue is proper in Los Angeles County pursuant to *Code of Civil Procedure* §§ 395(a) and 395.5 in that the liability arose there because at least some of the transactions that are the subject of this matter of this Complaint occurred therein and/or each Defendant either is found, maintains offices, transacts business, and/or has an agent therein.

III.

PARTIES AND GENERAL ALLEGATIONS

A. PLAINTIFF

9.     Plaintiff, GREGG BREVOORT is, and at all times mentioned in this Complaint was, a California resident.

B. DEFENDANTS

10.     Plaintiff is informed and believes and thereon alleges that Defendant G4S SECURE SOLUTIONS (USA) INC. ("G4S") is, and at all times mentioned in this Complaint was, a Florida Corporation, authorized to do business in the State of California with offices in Los Angeles, CA.

11.     Plaintiff is unaware of the true names and capacities of Defendants sued herein as DOES 1 through 50, inclusive, and therefore sues said Defendants by such fictitious names. Plaintiff is informed and believes and thereon alleges that said fictitiously named Defendants are in some manner responsible for the events and happenings alleged herein.

12.     Plaintiff is informed and believes and thereon alleges that at all times relevant herein, each Defendant was acting for his or its own personal account and as legal owners, lessors, operators, managers, maintainers, agent servant, employee, employer, trustee, trustor, representative, fiduciary, partner, co-venturer, officer, director, stockholder, principal or co-conspirator of each of the other Defendants, and as such was acting within the scope, course, and purpose of such authority, service, agency, fiduciary capacity, special trust partnership, employment or conspiracy.

13.     Plaintiff is further informed and believes and thereon alleges that each Defendant induced, collaborated, agreed with, conspired, or otherwise participated in the events constituting this Complaint; and thus, is responsible in some manner for the events and happenings, and proximately caused the injuries and damages as herein alleged.

14.     Where appearing herein, each and every reference to defendants or to any of them, is intended to be and is a reference to all Defendants hereto, and to each of them, named and unnamed, including all fictitiously named defendants, unless said reference is otherwise specifically qualified.

A.   <u>FACTS AND CIRCUMSTANCES COMMON TO ALL CAUSES OF ACTION</u>

15.     In May 2011 Mr. Brevoort was hired as a temporary employee by G4S to work at their office in the San Fernando Valley ("SFV Office").

16.     Mr. Brevoort's temporary assignment as a receptionist was to last between three days and two weeks. His duties included answering phones, receiving packages and mail, copying, and other related tasks.

17.     Almost immediately, Mr. Brevoort's assignment extended indefinitely, and his duties expanded to include applicant flow, PeopleSoft data entry, invoice processing, and paycheck processing.

### *Tenure with G4S*

18.     In November of 2011 Mr. Brevoort was hired as a permanent full-time receptionist and administrative assistant, retaining the responsibilities from his temporary position while also being made responsible for applicant flow up to the point of hiring.

19.     In the fall of 2012 G4S transitioned from paper applications to an online system. In February of 2013 Mr. Brevoort was sent to the San Jose office to assist with their use of the online system as he was one of few people in the company who had mastered its use.

20.     In July of 2013 Mr. Brevoort was promoted to "Training Manager," which duties included management of specific training for new security officers seeking to be duly licensed. However, Mr. Brevoort was promoted to this position without receiving any training himself from G4S. Without guidance, Mr. Brevoort single-handedly developed a training program for SFV from scratch, but Mr. Brevoort was never informed by G4S that this new training program was compliant. This is the basis of Mr. Brevoort's first of many grievances, primarily including his requests for guidance related to the new training program.

21.     In April of 2015, after roughly two years of complaints and requests by Mr. Brevoort, G4S sent Mr. Brevoort to Florida for a one-week training. The training, however, was only for Customer Service Excellence.

22.     While interacting with other trainers from around the country, Mr. Brevoort became aware that what was being done at the SFV Office (and Los Angeles Office) was not at all

in compliance with what most G4S offices were doing across the country. G4S Security Officers were supposed to receive thirty-two hours of pre-placement training as outlined in *Bus. & Prof. Code* § 7583.6, for the licensing of security guards. G4S required forty hours as Mr. Brevoort overheard from other trainers in Florida. This amount of training had never been in practice in the SFV Office (or LA Office). Mr. Brevoort also learned he was not a certified trainer, by either the State of California, or by G4S, while all the other trainers from around the country were certified.

23.     Upon his return Mr. Brevoort reported his observations to both the Operations Manager and the General Manager only to be told to keep doing what he was doing (providing only two days of training for new officers) and that they would arrange for Mr. Brevoort to be sent back to Florida to be trained as a Trainer. Mr. Brevoort never received any additional training, as a Trainer or otherwise.

24.     In June of 2015 the Operations Manager told Mr. Brevoort that G4S wanted Mr. Brevoort to take over all aspects of hiring – ad placement, applicant flow, and the scheduling of interviews. Mr. Brevoort objected as this would take away from his training responsibilities, it was not a sustainable model. Despite his objections Mr. Brevoort reluctantly took on the additional hiring responsibilities.

25.     When Mr. Brevoort was promoted, the office staff consisted of seven people, including himself. However, thereafter, during the time Mr. Brevoort was trying to balance his new hiring responsibilities, several payroll employees came and left G4S, finally leaving the SFV office without a payroll or HR representative. Much of the payroll and HR duties were absorbed by Mr. Brevoort and the Receptionist, as the staff had been ultimately reduced to only four.

26.     In May of 2017, with only a staff size of four, G4S hired a recruiter for the SFV Office. However, very little changed for Mr. Brevoort as he was still in charge of writing and placing the ads, mining the shortlists, and having the receptionist schedule interviews with the recruiter. Mr. Brevoort would still process hiring and facilitate training.

~~27.     At the time the recruiter was working in the office staff numbered four, including Mr. Brevoort.~~

---

28.     In July of 2017 Mr. Brevoort was made a salaried, exempt employee. Until this point Mr. Brevoort rarely worked overtime, as it had to be approved. Now on salary Mr. Brevoort was expected to work overtime hours and come in on weekends.

29.     Shortly thereafter Mr. Brevoort was informed that his new title would be HR Specialist, though he was never presented with a new conditional job description or additional human resources training. While some of his job duties were aspects of HR that he was already performing, such as hiring and orientations, there were many aspects of the job that he was not qualified for or familiar with. Despite his lack of training Mr. Brevoort proceeded as he had been forced to do so many times in the past – in protest – he figured out what needed to be done and learned the procedures.

30.     In July of 2018 Mr. Brevoort's title was changed from Training Manager to Interview Specialist, though he would continue to train new security officers. Mr. Brevoort was informed that G4S would be firing both the recruiter and the receptionist in the SFV office. Mr. Brevoort was additionally made an hourly, non-exempt employee again, but did not receive a scheduled wage increase.

31.     Mr. Brevoort was also expected to continue training new hires in addition to his new duties. As there weren't enough hours in Mr. Brevoort's day to train and accomplish all of the new duties thrust upon him. Mr. Brevoort suggested that the LA office could conduct some training for the new SFV Office security officers. Mr. Brevoort, however, would continue to train all newly hired Certified Protection Officers.

32.     Now that the recruiter and receptionist were fired Mr. Brevoort was alone in the SFV office, with the exception of a roving area supervisor who came and went at will.

33.     After only a few days of Mr. Brevoort being left alone in the office G4S realized their changes weren't working a temporary receptionist was hired.

34.     In or about January or February of 2019 the area supervisor made it known that he did not like the gay male receptionist. The area supervisor wanted the receptionist fired but did not have the authority to do so. Mr. Brevoort did not want the receptionist fired, and the area

supervisor stewed over it. The area supervisor then became hostile and obnoxious in his comments towards the receptionist, trying to set the receptionist up to be fired.

35.     One day, the operations manager from the LA office approached Mr. Brevoort and asked if he had seen anything unusual between the area supervisor and receptionist. The area supervisor had alleged that the receptionist had made unwanted advances towards him. Mr. Brevoort confirmed that he had never seen any such advances occur in the office. The receptionist also denied that there were any sexual advances made and called the allegations ridiculous.

36.     The area supervisor continued to have outbursts of hostility towards the receptionist and was hostile with everyone in the office for weeks after the false reporting of sexual harassment did not result in the receptionist's termination. Mr. Brevoort was made so uncomfortable by the whole situation that he tried to ensure he was never alone in the same room as the area supervisor now knowing how the supervisor felt about homosexuals. Mr. Brevoort began to fear what could be done to find cause to terminate him where none existed due to his sexual orientation. He feared his supervisors could engage in the same nefarious tactics to have him terminated.

37.     The operations manager and HR manager, both based out of the LA office, were aware of the false allegations made by the area supervisor and his hostile attitude in the SFV office but chose to do nothing to rectify the situation.

38.     The area supervisor's attempt to defame a competent employee in order to have him fired for cause when no cause existed was entirely an invention of the area supervisor, who was intent on ending an employee's career for his sexual orientation. The area supervisor was not held responsible by G4S for his obvious ruse.

39.     There was a culture of hostility towards homosexuals in SFV Office. In addition to the false allegations of sexual harassment made by the area supervisor against the receptionist, there were also managers who would use words such as "fag" and "faggy" in the office, making Mr. Brevoort, a homosexual, very uncomfortable. One of Mr. Brevoort's male coworkers referred to Mr. Brevoort as his "work-wife," Mr. Brevoort's sexual orientation was not a secret in the office.

40.     In July of 2019 Mr. Brevoort received an unannounced raise of ninety-eight cents per hour. He learned that his General Manager had put in the request following a glowing performance appraisal regarding Mr. Brevoort's work and attention to detail. Mr. Brevoort had become an expert at writing job descriptions and was often asked to write job descriptions for other offices. Mr. Brevoort was a rising star for G4S.

41.     Mr. Brevoort would frequently receive phone calls from offices around the country because employees were told to ask him how to perform certain tasks, often regarding matters that were far afield of Mr. Brevoort's duties, responsibilities, and familiarity. Often on regional and national conference calls Mr. Brevoort would be referred to as a "Rock Star" and it was encouraged that others reach out to him for advice and best practices. Often these calls would be led by corporate managers from the main office in Florida.

42.     On September 13, 2019 the General Manager of the SFV and LA offices abruptly quit. Suddenly, the Regional Vice President paid Mr. Brevoort a visit in the SFV office to see how things were going. Mr. Brevoort was honest and told the Vice President that things were going poorly. Specifically, Mr. Brevoort pointed out, as he had on numerous occasions, that the security officers (some of whom were expected to carry weapons) were not being fully and completely trained within reason or the law and that his workload was causing frequent meal period violations and daily rest break violations.

43.     The Vice President became impatient and said that he "needed solutions." Mr. Brevoort tried to remind the Vice President that the office was at its best when it was fully staffed – at the moment there was only Mr. Brevoort and a temporary employee. The Vice President noted that there was a hiring freeze and insisted Mr. Brevoort do more, delegate more tasks to the temp, and essentially run SFV by himself and told Mr. Brevoort he needed to be more of a "*team player*." Each time Mr. Brevoort made these assertions, his standing in the company was threatened. It was made clear that he needed to go along with the illegal and unethical company practices, or he would be terminated.

44.     A couple of days after the Vice President's visit another group from G4S came to the SFV office. One of the members of the group was to be the new General Manager. The

General Manager never spoke with Mr. Brevoort directly, but sent others into Mr. Brevoort's office to "negotiate" with him to encourage him to agree to expand his hours and do more recruiting. Mr. Brevoort was already working ten-hours per day and working most weekends.

45.     Mr. Brevoort did not know how much more he could do. Mr. Brevoort was again reminded that he needed to be a "team player" or else he could lose his job. With no other option but to agree, Mr. Brevoort opened-up the interview schedule and orientation time slots knowing that double bookings would occur and cause further workload difficulties. G4S also made Mr. Brevoort agree to perform outside recruiting which would require him to visit area schools, employment centers, and military bases to attract new recruits all while performing his other essential in-office duties. The group then left, and Mr. Brevoort was again left with no additional resources or assistance. Every time Mr. Brevoort raised issues with G4S's undertraining of officers or consistent meal and wage violations he was immediately assigned additional work to perform.

46.     In daily conference calls whenever Mr. Brevoort would try to make a suggestion or point out inconsistencies in practices, he would be chastised for not being "on-board." During these calls G4S kept piling on additional duties – new spreadsheets to be maintained, new metrics to meet – without any relief or support staff. Mr. Brevoort's workload was so large that the lack of support staff to assist with the numerous duties forced Mr. Brevoort to continuously miss rest breaks and abbreviate or completely miss his meal breaks. G4S was not willing to provide Mr. Brevoort the support staff he had long required and requested.

47.     On October 15, 2019 G4S surprised Mr. Brevoort with another new job title – HR Generalist. The change was backdated to October 7, 2019 with no pay increase. Mr. Brevoort had to request a copy of the job description, and it again detailed HR responsibilities that Mr. Brevoort was not qualified for or trained to perform. As usual, Mr. Brevoort taught himself several of the required tasks, but much of the new duties were outside his scope.

48.     On October 15, 2019 Mr. Brevoort was also informed that he was no longer allowed to send any SFV Office new hires to the LA Office for any training. Mr. Brevoort would now have to fully train all new hires completely for the required forty hours. Mr. Brevoort was

now expected to cover *three* full time positions – Recruiter, HR Generalist, and Trainer. Again, he was told to "be on board" and to "stop pushing back" or else he would be in danger of losing his job.

### Termination

49.    On October 25, 2019 Mr. Brevoort was told to report to the Anaheim, California office on October 28, 2019 for an investigation regarding newly hired officers for the SFV Office cheating on a psychological test. It was brought to Mr. Brevoort's attention that the officers had clearly copied off of each other as they had identical answers on what was supposed to be a subjective test.

50.    Mr. Brevoort was instructed to retest them separately. Mr. Brevoort was also advised that going forward the new "best practice" would be separating examinees during their test. Mr. Brevoort agreed to facilitate the new procedure.

51.    In Mr. Brevoort's eight-and-one-half-years at G4S there had never before been an outlined procedure or training regarding the proper proctoring of the psychological test. Proctoring simply amounted to Mr. Brevoort setting up the test, having applicants take the test, then scanning the answer sheets and submitting them to the corporate office in Florida via e-mail. It was never communicated to Mr. Brevoort that he was expected to sit and monitor the taking of the subjective test. As the test takes approximately an hour to complete, and as Mr. Brevoort was performing the tasks of three full-time employees Mr. Brevoort would routinely return to his office and continue with his work while applicants took the test. In fact, this process was undertaken exactly as he had been trained and was the model of previous employees of G4S. Mr. Brevoort had never been told that any other procedures or monitoring were expected.

52.    At the end of the investigative interview Mr. Brevoort was told that he was being put on administrative leave and that he would be informed of the outcome shortly. On Thursday, October 31, 2019, at approximately 8:30 p.m. Mr. Brevoort received a text message from the Los Angeles Operations Manager stating that he was expected to meet with his HR Manager in his office on Friday morning at 11:00 a.m.

*Brevoort v. G4S*– FIRST AMENDED COMPLAINT FOR DAMAGES

53.     On Friday, November 1, 2019 Mr. Brevoort arrived at 11:00 a.m., as instructed, to find his two direct supervisors awaiting his arrival. They entered his office and presented him with his final paychecks. Both expressed dismay at his being terminated. The supervisors related that they both disagreed with the decision, but it had been made at the corporate level. It was expressed that corporate had "lost confidence in [Mr. Brevoort's] ability to perform best practices" regarding the proctoring of the psychological test. No further explanation was provided, but this explanation was clearly pretext for Mr. Brevoort's firing as he had been informed of the *new* testing "best practices" *going forward* and Mr. Brevoort agreed to follow those practices as outlined.

54.     At the end of October 2019, USA Today published an expose on G4S, pointing out the company's many questionable practices. The article led to several company emails sent out by the president and CEO. The article called into question the inadequate background investigations of officers and G4S's questionable psychological testing practices. This article was the first in a series published by USA Today.

55.     While meeting with his direct supervisors to be terminated Mr. Brevoort expressed that he felt that he was being terminated as a scapegoating response to the USA Today article. Both supervisors agreed with Mr. Brevoort emphatically. They also agreed with Mr. Brevoort that his firing was also in retaliation for his pushing back against G4S as they tried to unreasonably demand he take on more and more responsibility. The supervisors also explained to Mr. Brevoort that standard disciplinary actions that could lead to termination typically are addressed first with verbal then with written warnings before termination. Mr. Brevoort had never received a disciplinary action or written warning.

56.     While Mr. Brevoort was cleaning out his desk, he overheard his direct supervisors arranging for *three* employees from other offices to cover the SFV Office, proving that Mr. Brevoort was doing the work of *at least* three employees

57.     Mr. Brevoort had always been an exceptional employee. In fact, Mr. Brevoort's last performance review from January 2019, was 100-percent positive and resulted in Mr. Brevoort receiving a ninety-eight-cent-per-hour raise in April 2019.

///

*Termination Aftermath*

58.     While on the way home at 5:00 p.m. on the day of his termination, Mr. Brevoort stopped at his care provider's Urgent Care as he found himself to be extremely agitated and distressed. The stress and anxiety of the last few months, the past week of "administrative leave," and the weight of his termination was, and continues to be, debilitating.

59.     Mr. Brevoort is currently under the care of his primary care physician, as well as a psychologist and a psychiatrist. His physical and mental health treatment has been ongoing since the date of his termination.

60.     Mr. Brevoort faithfully served G4S for eight-and-one-half years before he was terminated from his position, whereby he experienced a loss of income and suffered an immense amount of physical and emotional distress. In fact, Mr. Brevoort received EDD/SDI for stress and anxiety disability for the period of November 1, 2019 through December 1, 2019.

61.     At no time during his eight-and-one-half-year tenure with G4S, from May 2011 through November 2019, whether exempt or non-exempt, was Mr. Brevoort ever offered, afforded, nor did he take a single fifteen-minute break. In fact, he rarely took a full-length, work-free lunch. Further, he was never compensated for the breaks he was forced to miss.

*Unemployment Claim*

62.     On December 1, 2019, Mr. Brevoort applied for unemployment benefits. During a phone conference with the Employment Development Department, Mr. Brevoort was asked to confirm his reason for termination, which G4S told him was, "*Work Performance/Qualifications*." G4S told the EDD it was "*Voluntary Separation – Other Employment*." This misrepresentation by G4S led the EDD to open an investigation and cause a delay in Mr. Brevoort receiving benefits.

///

IV.

<u>CAUSES OF ACTION</u>

***First Cause of Action***

**FAILURE TO PROVIDE MEAL PERIODS**

(*Lab. Code* §§ 226.7, 512, 516 & *IWC Wage Orders*)

(*Against All Defendants*)

63.     Plaintiff re-alleges and reincorporates each and every allegation contained in all previous paragraphs of all previous sections and Causes of Action in this Complaint, inclusive, as though fully set forth herein.

64.     *Lab. Code* § 226.7(a) provides:

"*No employer shall require any employee to work during any meal or rest period mandated by an applicable order of the Industrial Welfare Commission*."

65.     *Lab. Code* § 512 provides:

"*An employer may not employ an employee for a work period of more than five hours per day without providing the employee with a meal period of not less than 30 minutes, except that if the total work period per day of the employee is no more than six hours, the meal period may be waived by mutual consent of both the employer and employee*."

66.     *Lab. Code* § 512 provides*:*

"*An employer may not employ and employee for a work period of more than 10 hours per day without providing the employee with a second meal period of not less than 30 minutes, except that if the total hours worked is no more than 12 hours, the second meal period may be waived by mutual consent of the employer and the employee only if the first meal period was not waived.*"

67.     *Lab. Code* § 516 provides that the Industrial Welfare Commission may adopt or amend working condition orders with respect to meal periods for any workers in California consistent with the heal and welfare of those workers.

68.     *IWC Wage Order* § 11(c) provides:

*"Unless the employee is relieved of all duty during a 30-minute meal period, the meal period shall be considered an 'on duty' meal period and counted as time worked. An 'on duty' meal period shall be permitted only when the nature of the work prevents an employee from being relieved of all duty and when by written agreement between the parties an on-the-job paid meal period is agreed to. The written agreement shall state that the employee may, in writing, revoke the agreement at any time."*

69.    *IWC Wage Order* § 11(d) provides:

"*If an employer fails to provide an employee a meal period in accordance with the applicable provisions of this order, the employer shall pay the employee one (1) hour of pay at the employee's regular rate of compensation for each workday that the meal period is not provided*."

70.    At least once per week during his employment Mr. Brevoort was either not given lunch breaks or was forced to take abbreviated or working lunch breaks as a result of the impossible scheduling demands set forth by the company. Mr. Brevoort was regularly double-booked in order to complete the numerous tasks he was assigned to complete daily.

71.    Mr. Brevoort frequently worked ten-hour days with no rest breaks and no lunch break or would be forced to work during his lunch breaks or shorten them.

72.    Throughout Mr. Brevoort 's employment with G4S from November 2011 through November 2019 there were daily violations of the wage, meals break, and ten-hour-day breaks, each of which provide for statutory penalties in circumstances where there is a violation.

73.    Mr. Brevoort did not waive his meal periods by mutual consent with G4S or otherwise.

74.    Mr. Brevoort did not enter into any written agreement with G4S agreeing to an on-the-job paid meal period.

75.    Pursuant to *Lab. Code* §§ 218.6 and 1194(a), *Civ.C.* §§ 3287(b) and 3289, Plaintiff seeks recovery of pre-judgment interest on all amounts recovered herein.

76.    Mr. Brevoort has suffered a loss of income and suffered an immense amount of physical and emotional distress as a result of G4S's decision to impose a work schedule and

environment in which Mr. Brevoort was in the office ten or more hours per day and unable to take rest or meal breaks, and their ultimate decision to terminate Mr. Brevoort's employment.

### *Second Cause of Action*

### **FAILURE TO PROVIDE PAID REST BREAKS**

(*Lab. Code* §§ 226.7, 516, and *IWC Wage Orders*)

(*Against All Defendants*)

77.     Plaintiff realleges and reincorporates each and every allegation contained in all previous paragraphs of all previous sections and Causes of Actions in this Complaint, inclusive, as though fully set forth herein.

78.     *Lab. Code* § 226.7(a) provides:

> *"No employer shall require any employee to work during any meal or rest period mandated by an applicable order of the Industrial Welfare Commission."*

79.     *Lab. Code* § 516 provides that the Industrial Welfare Commission may adopt or amend working condition orders with respect to break periods for any workers in California consistent with the health and welfare of those workers.

80.     *IWC Wage Order* § 12(A) provides:

> *"Every employer shall authorize and permit all employees to take rest periods, which insofar as practicable shall be in the middle of each work period. The authorized rest period time shall be based on the total hours worked daily at the rate of ten (10) minutes net rest time per four (4) hours or major fraction thereof. However, a rest period need not be authorized for employees whose total daily work time is less than three and one-half (3.5) hours. Authorized rest period time shall be counted as hours worked for which there shall be no deduction from wages."*

81.     *IWC Wage Order* § 12(B) provides:

> *"If an employer fails to provide an employee a rest period in accordance with the applicable provisions of this order, the employer shall pay the employee one (1) hour of pay at the employee's regular rate of compensation for each workday that the rest period is not provided."*

82.     Mr. Brevoort worked consistently over four hours per shift and was therefore entitled to a rest period of not less than ten minutes per shift worked.

83.     G4S failed to authorize and permit the required rest periods and incorrectly considered Mr. Brevoort to be exempt from meal period requirements established by *Lab. Code* § 226.7 and § 516 and *IWC Wage Order* § 12.

84.     Throughout his tenure with G4S, from November 2011 through November 2019, Mr. Brevoort was *never* given unpaid breaks during the day.

85.     Pursuant to *Lab. Code* § 558(a) which provides that any employer who violates any provision regulating hours and days of work in any order of the Industrial Welfare Commission shall be subject to a penalty, Mr. Brevoort seeks recovery of compensation pursuant to *Lab. Code* §§ 558(a)(1) and  558(a)(2).

86.     Pursuant to *Lab. Code* §§218.6, 194(a), and *Civ.C* §§ 3287(b) and 3289 Mr. Brevoort seeks recovery of pre-judgment interest on all amounts recovered herein.

87.     Pursuant to *Lab. Code* §§ 218.5 and 1194 Mr. Brevoort requests that the Court award reasonable attorneys' fees and costs incurred in this action.

88.     Mr. Brevoort has suffered a loss of income and suffered an immense amount of physical and emotional distress as a result of G4S's decision to impose a work schedule and environment in which Mr. Brevoort was in the office ten or more hours per day and unable to take rest or meal breaks, and their ultimate decision to terminate Mr. Brevoort's employment.

### *Third Cause of Action*

### HOSTILE WORK ENVIRONMENT

(*Gov. Code* § 12940(j))

(*Against All Defendants*)

89.     Plaintiff realleges and reincorporates each and every allegation contained in all previous paragraphs of all previous sections and Causes of Actions in this Complaint, inclusive, as though fully set forth herein.

90.     *Gov. Code* § 12940(j)(1) provides, in part:

It is an unlawful employment practice *"...to harass an employee, an applicant, an unpaid intern or volunteer, or a person providing services pursuant to a contract. Harassment of an employee, an applicant, an unpaid intern or volunteer, or a person providing services pursuant to a contract by an employee, other than an agent or supervisor, shall be unlawful if the entity, or its agents or supervisors, knows or should have known of this conduct and fails to take immediate and appropriate corrective action."*

91.     Mr. Brevoort was employed by G4S Secure Solutions (USA) Inc. from May 2011 through November 2019.

92.     G4S and its employees did not hesitate to show disdain for Mr. Brevoort repeatedly over his eight-and-one-half-year tenure as an employee, including managers using homophobic slurs in the office that were known to be hurtful to Mr. Brevoort, a gay man There was a culture and pattern of open hostility towards homosexuals in the office.

93.     Mr. Brevoort was also afraid to be alone in the same room as the area supervisor after said supervisor made it clear that he wanted "the gay male receptionist" fired. When the receptionist was not fired the area supervisor accused the receptionist of sexual harassment. As Mr. Brevoort is also a gay man, he feared the area supervisor would attempt to ruin Mr. Brevoort's reputation and career in the same or similar manner.

94.     In addition to the hostility and fear of termination Mr. Brevoort experienced due to his sexual orientation, Mr. Brevoort was given a new list of duties and tasks each time he complained to his supervisors. Mr. Brevoort was required to cover the work of three employees, received no support staff, and received no support from his superiors. Mr. Brevoort complained about this workload, that it was unsustainable, or that G4S's practices were non-compliant, but each time he did he was told to stop complaining and was retaliated against and assigned more work which further complicated his already overburdened schedule.

95.     G4S's refusal to address overt and ongoing issues undertaken and perpetuated by its employees and managers was a policy that created a harsh, aggressive, and hostile work environment.

96.     Every time an issue arose which demanded that management take swift corrective action to right the atmosphere in the office and corporate culture, G4S's response was seemingly unapologetic about the conditions being fostered and perpetuated. Mr. Brevoort was told to stop being a complainer and to "get on-board", be a "team player", and "go with it".

97.     Given the history of employee and management conduct at G4S, as evidenced throughout Mr. Brevoort's tenure, there is little doubt that the work environment in which Mr. Brevoort and his fellow employees were forced to function was hostile.

98.     The immediate supervisors and executive administrators were unconscionable in their actions and contributed in a measurable way to the hostility of the office environment at G4S, and the hostility specifically and consistently directed at Mr. Brevoort.

99.     Mr. Brevoort has suffered a loss of income and suffered an immense amount of physical and emotional distress as a result of G4S's scheduling demands, company culture, and their ultimate decision to terminate Mr. Brevoort's employment.

### Fourth Cause of Action

### UNLAWFUL RETALIATION IN VIOLATION OF PUBLIC POLICY

### (WHISTLEBLOWER PROTECTIONS)

(*Lab. Code* § 1102.5)

(*Against All Defendants*)

100.     Plaintiff realleges and reincorporates each and every allegation contained in all previous paragraphs of all pervious sections and Causes of Actions in this Complaint, inclusive, as though fully set forth herein.

**A. Count 1**

101.     *Lab. Code* § 1102.5(a) provides:

*"An employer, or any person acting on behalf of the employer, shall not make, adopt, or enforce any rule, regulation, or policy preventing an employee from disclosing information to a government or law enforcement agency, to a person with authority over the employee, or to another employee who has authority to investigate, discover, or correct the violation or noncompliance, or from providing information to, or testifying before, any public body*

*conducting an investigation, hearing, or inquiry, if the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation, regardless of whether disclosing the information is part of the employee's job duties."*

102.    Mr. Brevoort was employed by G4S Secure Solutions (USA) Inc. from May 2011 through November 2019.

103.    Whenever Mr. Brevoort would complain about the unlawful, unsafe, unethical, or otherwise improper conduct his superiors would direct and demand that he proceed with either fostering the circumstances surrounding the conduct or engage in it himself, forcefully and unequivocally implying (or outright stating) that Mr. Brevoort's job would be in jeopardy if he refused.

104.    Mr. Brevoort raised a great many issues about policies and procedures forced onto him by G4S, policies which he also believed to be a violation of the law. Mr. Brevoort brought the lack of training provided to security officers to the attention of his supervisors, security officers from the SFV office were not being given the state-mandated thirty-two hours of training, and were instead being given only two days (sixteen hours) of training. Mr. Brevoort also frequently complained about his long working hours and inability to take meal and rest breaks due to the expectations put upon him by G4S.

105.    Every time Mr. Brevoort raised issues with G4S's undertraining of officers or consistent meal and wage violations he was immediately assigned additional work to perform.

106.    Mr. Brevoort's complaints about the conduct he was directed to comply with led to G4S's decision to terminate Mr. Brevoort's employment.

107.    Mr. Brevoort 's termination was clearly in violation of public policy and was a direct result of G4S's administrators and managers demanding under threat of hostile employment action that Mr. Brevoort cease warning of conduct he believed problematic.

108.    Mr. Brevoort has suffered a loss of income and suffered an immense amount of physical and emotional distress as a result of G4S's decision to impose a work schedule and

environment in which Mr. Brevoort was in the office ten or more hours per day and unable to take rest or meal breaks, and their ultimate decision to terminate Mr. Brevoort's employment.

**B. Count 2**

109.    Mr. Brevoort was employed by G4S Secure Solutions (USA) Inc. from May 2011 through November 2019.

110.    Whenever Mr. Brevoort would complain about the unlawful, unsafe, unethical, or otherwise improper conduct his superiors would direct and demand that he proceed with either fostering the circumstances surrounding the conduct or engage in it himself, forcefully and unequivocally implying (or outright stating) that Mr. Brevoort's job would be in jeopardy if he refused.

111.    Mr. Brevoort raised a great many issues about policies and procedures forced onto him by G4S, policies which he also believed to be a violation of the law. Mr. Brevoort brought the lack of training provided to security officers to the attention of his supervisors, security officers from the SFV office were not being given the state-mandated thirty-two hours of training, and were instead being given only two days (sixteen hours) of training. Mr. Brevoort also frequently complained about his long working hours and inability to take meal and rest breaks due to the expectations put upon him by G4S. G4S was finely tuned-in to these complaints.

112.    Mr. Brevoort's complaints about the conduct he was directed to comply with led to G4S's decision to terminate Mr. Brevoort's employment.

113.    Mr. Brevoort 's termination was clearly in violation of public policy and was a direct result of G4S's administrators and managers demanding under threat of hostile employment action that Mr. Brevoort cease warning of conduct he believed problematic.

114.    Mr. Brevoort has suffered a loss of income and suffered an immense amount of physical and emotional distress as a result of G4S's decision to impose a work schedule and environment in which Mr. Brevoort was in the office ten or more hours per day and unable to take rest or meal breaks, and their ultimate decision to terminate Mr. Brevoort's employment.

///

*Fifth Cause of Action*

**UNFAIR COMPETITION**

(*Bus. & Prof. Code* § 17200)

(*Against All Defendants*)

115.     Plaintiff realleges and reincorporates each and every allegation contained in all previous paragraphs of all previous sections and Causes of Actions in this Complaint, inclusive, as though fully set forth herein.

116.     The unlawful conduct of G4S alleged herein amounts to and constitutes unfair competition within the meaning of the *Bus. & Prof. Code* § 17200. Due to its unfair and unlawful business practices in violation of the Labor Code, G4S has unfairly gained a competitive advantage over other comparable companies doing business in California that comply with their legal obligations under the Labor Code.

117.     Mr. Brevoort had been forced to work ten-hour days and most weekends in a futile attempt to keep up with the workload that was being put upon him by G4S Security Solution (USA) Inc.

118.     When Mr. Brevoort tried to make G4S understand that there was no room in his schedule for all that they demanded he do – the work of three full-time employees – he was told to stop complaining and was threatened with termination.

119.     As a result of G4S's unfair competition as alleged herein, Mr. Brevoort has suffered injuries in fact and lost money or property from not being paid all earned wages due to regularly being made to miss rest and meal breaks, as well as being provided with accurate written wage statements.

120.     Mr. Brevoort is informed and believes and thereon alleges that G4S may have acquired interests in money or property from employees from not paying them all earned straight time, overtime, and continuation wages, as well as from not providing them with accurate written wage statement.

121.   Pursuant to *Bus. &Prof. Code* § 17203 Mr. Brevoort seeks to recover all money or property that G4s may have acquired as a result of their unlawful and unfair business practices as alleged herein.

122.   Pursuant to *Civ. Proc. Code* § 1021.5 the substantial benefit doctrine, and/or the common fund doctrine, Mr. Brevoort seeks and award of reasonable attorneys' fees.

123.   Mr. Brevoort has suffered a loss of income and suffered an immense amount of physical and emotional distress as a result of G4S's scheduling demands, company culture, and their ultimate decision to terminate Mr. Brevoort's employment.

*Sixth Cause of Action*

**SEXUAL ORIENTATION DISCRIMINATION**

(*Gov. Code* § 12940(j))

(*Against All Defendants*)

124.   Plaintiff realleges and reincorporates each and every allegation contained in all previous paragraphs of all previous sections and Causes of Actions in this Complaint, inclusive, as though fully set forth herein.

125.   *Gov. Code* § 12940(j)(1) provides, in part:

That it is an unlawful employment practice *"...to harass an employee, an applicant, an unpaid intern or volunteer, or a person providing services pursuant to a contract. Harassment of an employee, an applicant, an unpaid intern or volunteer, or a person providing services pursuant to a contract by an employee, other than an agent or supervisor, shall be unlawful if the entity, or its agents or supervisors, knows or should have known of this conduct and fails to take immediate and appropriate corrective action."*

126.   Mr. Brevoort was employed by G4S Secure Solutions (USA) Inc. from May 2011 through November 2019.

127.   G4S subjected Mr. Brevoort to harassment based upon his sexual orientation as a homosexual through overt comments, narratives, statements, conduct, and other actions that contributed to the hostile work environment he was forced to endure over the course of his tenure.

128.   The harassment and discrimination experienced by Mr. Brevoort for his sexual orientation was constant around the office at G4S; from brazen use of slurs used by managers and staff alike to humiliating nicknames given to him by co-workers. There was a culture of open hostility towards homosexuals in the office.

129.   Mr. Brevoort was fearful that he would be terminated due to his sexual orientation. In or about January or February of 2019 the area supervisor made it known that he did not like the gay male receptionist. The area supervisor wanted the receptionist fired but did not have the authority to do so. Mr. Brevoort did not want the receptionist fired, and the area supervisor stewed over it. The area manager false accused the receptionist of sexual harassment as a way to have the receptionist fired for cause when no cause existed. Mr. Brevoort began to fear what could be done to him to find cause to terminate him where none existed due to his sexual orientation; that his supervisors could engage in the same nefarious tactics to have him terminated.

130.   The operations manager and HR manager, both based out of the LA office, were aware of the false allegations made by the area supervisor and his hostile attitude in the SFV office but chose to do nothing to rectify the situation. The area supervisor was not held responsible by G4S for his obvious ruse.

131.   In addition to the false allegations of sexual harassment made by the area supervisor against the receptionist, there were also managers who would use words such as "fag" and "faggy" in the office, making Mr. Brevoort, a homosexual, very uncomfortable. One of Mr. Brevoort's male coworkers referred to Mr. Brevoort as his "work-wife."

132.   On information and belief, Mr. Brevoort's sexual orientation was a motivating factor behind G4S's decision to terminate Mr. Brevoort's employment and the conditions he was forced to endure during his time at G4S. Mr. Brevoort had always been an exceptional employee, never receiving a disciplinary action or write-up.

133.   Mr. Brevoort has suffered a loss of income and suffered an immense amount of physical and emotional distress as a result of G4S's decision to uphold a company culture in which Mr. Brevoort was constantly discriminated against for his sexual orientation, being

subjected to homophobic slurs and humiliating nicknames and the ultimate decision to terminate Mr. Brevoort's employment.

*Seventh Cause of Action*

**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

(*Against All Defendants*)

134.    Plaintiff realleges and reincorporates each and every allegation contained in all previous paragraphs of all pervious sections and Causes of Actions in this Complaint, inclusive, as though fully set forth herein.

135.    Intentional Infliction of Emotional Distress requires that the Defendant's conduct was outrageous, that Defendant intended to harm Plaintiff with that conduct, that the Plaintiff suffered severe emotional distress, and that the Defendant's conduct was a substantial factor in causing that stress.

136.    G4S subjected Mr. Brevoort to harassment based upon his sexual orientation as a homosexual through overt comments, narratives, statements, conduct, and other actions that contributed to the hostile work environment he was forced to endure over the course of his tenure.

137.     The harassment and discrimination experienced by Mr. Brevoort for his sexual orientation was constant around the office at G4S; from brazen use of slurs used by managers and staff alike to humiliating nicknames given to him by co-workers.

138.    Managers would use words such as "fag" and "faggy" in the office, making Mr. Brevoort, a homosexual, very uncomfortable. One of Mr. Brevoort's male coworkers referred to Mr. Brevoort as his "work-wife." There was a culture of open hostility towards homosexuals in the office.

139.    Mr. Brevoort was fearful that he would be terminated due to his sexual orientation. In or about January or February of 2019 the area supervisor made it known that he did not like the gay male receptionist. The area supervisor wanted the receptionist fired but did not have the authority to do so. Mr. Brevoort did not want the receptionist fired, and the area supervisor stewed over it. The area manager false accused the receptionist of sexual harassment as a way to have the receptionist fired for cause when no cause existed. Mr. Brevoort began to fear what could be done

to him to find cause to terminate him where none existed due to his sexual orientation; that his supervisors could engage in the same nefarious tactics to have him terminated. The area supervisor was not held responsible for his obvious ruse.

Mr. Brevoort has suffered a loss of income and severe emotional distress as a result of the extreme and outrageous conduct of the personnel employed by G4S.

WHEREFORE, Plaintiff prays for Judgment and Order against the Defendants, as follows:

1. For actual damages in an amount according to proof at time of trial;

2. For general damages in an amount according to proof at time of trial;

3. For interest at 10% per annum as allowed by law;

4. For punitive damages in an amount appropriate to punish Defendants and others from engaging in similar misconduct;

5. For costs of suit incurred

6. For reasonable attorney fees, as allowed by law and contract;

7. For any further relief the Court deems just and proper.


Dated: July 16, 2020          Respectfully Submitted,

                              HERRERA LAW PARTNERS

                      By: _____
                              Evan Michael Hess, Esq.
                              *Attorneys for Plaintiff, Gregg Brevoort*

PROOF OF SERVICE
STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is 135 Bay Street, Suite 8, Santa Monica, CA 90405.

On July 16, 2020, I served the foregoing document described as FIRST AMENDED COMPLAINT FOR DAMAGES;      on the parties to this action as follows:

> Shelby K. Kroeger
> DINSMORE & SHOHL LLP
> 655 West Broadwaty, Suite 800
> San Diego, CA 92101
> Shelby.kroeger@dinsmore.com
>
> *Attorneys for Defendants G4S Secure Solutions*

☒ **BY ELECTRONIC TRANSMISSION ONLY**. Only by emailing the document(s) to the person(s) at the email address(es) listed, based on the following notice that, "**DURING THE ONGOING COVID-19 CORONAVIRUS PANDEMIC THIS OFFICE WILL BE WORKING REMOTELY, UNABLE TO SEND AND RECEIVE PHYSICAL MAIL AS USUAL, AND IS USING ONLY ELECTRONIC MAIL AT THIS TIME.**" No electronic message or other indication that the transmission was unsuccessful was received within a reasonable time after the transmission of the document(s).

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this July 16, 2020, in Santa Monica, California.

Alejandro Herrera